(No. 15860.—Reversed and remanded.)

THE TAZEWELL COAL COMPANY, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(PAUL QUINN, Defendant in Error.)

*Opinion filed April 14, 1924.*

1. WORKMEN'S COMPENSATION—*what is sufficient absence from work to allow claim within eighteen months after employee's return.* The proviso to section 24 of the Compensation act, allowing claim to be made within eighteen months after the employee returns to work, does not apply where the injury is so slight that the employee loses no time except the few minutes occupied in having his injuries treated by the employer's physician, but said proviso applies where the employee is absent for two days while his injuries are bandaged by the physician, at the expiration of which time he returns to work.

2. SAME—*burden is on employee to prove connection between subsequent disability and injury six months before.* Where an employee, under the advice of a physician, returns to work within two days after his injury and continues to do his regular work until he develops fainting spells about six months later, the burden is on the employee claiming compensation upon the ground of the subsequent disability to prove that the fainting spells were the result of the injury, although the first spell occurred within three weeks after the injury, according to his testimony.

3. SAME—*period of temporary total or partial disability cannot be foretold.* Neither the Industrial Commission nor the courts are authorized to speculate as to the probable length of a period of temporary total or partial incapacity, and such period can only be determined when it ends.

312—10

WRIT OF ERROR to the Circuit Court of Tazewell county; the Hon. C. V. MILES, Judge, presiding.

WILLIAM A. POTTS, for plaintiff in error.

DAILEY, MILLER, McCORMICK & RADLEY, for defendant in error.

Mr. JUSTICE DUNN delivered the opinion of the court:

Paul Quinn, a young man ninenteen years old, was an employee of the Tazewell Coal Company as a mule driver, and on September 29, 1919, received an injury in the course of and arising out of his employment, caused by a collision of cars. The injury occurred about one o'clock, and he finished the day's work, which ended at 3:30, and did not work for two days. He returned to work on the third day, October 2. On October 9, 1920, he filed with the Industrial Commission an application for an award of compensation, and upon a hearing before an arbitrator an award was made on November 15, 1920, that he was entitled to receive all necessary first aid medical, surgical and hospital services, as provided in paragraph (*a*) of section 8 of the Workmen's Compensation act. Upon his petition the Industrial Commission reviewed the award, made a finding that as a result of his injury the applicant will be partially incapacitated for work for a period of 377 weeks, beginning July 1, 1921, and awarded compensation at the rate of $6.50 a week for that period. Upon a review of the record by *certiorari* the circuit court of Tazewell county confirmed the award, and a writ of error has been allowed to review this judgment.

It is argued that a demand for compensation was not made within the time required by law. No demand was made within six months of the injury, but the application for an award was filed within eighteen months after the return of the employee to work, as provided by the pro-

viso to section 24 of the Compensation act. The absence was for two days, only, but in *Omaha Supply Co.* v. *Industrial Com.* 306 Ill. 384, the proviso was held to apply where the absence because of the injury was six days, and the length of the absence does not affect the principle where there has been an injury and partial incapacity, though, as was held in *Swift & Co.* v. *Industrial Com.* 299 Ill. 587, and *American Glyco Metal Co.* v. *Industrial Com.* 306 id. 421, the proviso does not apply where the injury is so slight that the employee loses no time except the few minutes occupied in having his injuries treated by the employer's physician.

The plaintiff in error argues that Quinn's injury did not result in any disability which prevented him from working, but the testimony shows that he did receive an injury to his chest which required treatment; that he went to a doctor for that purpose after he left the mine, was bandaged and remained bandaged for a day or two. At the expiration of that time he went to Dr. Niergarth and said that he thought he could go to work, and the doctor told him to go to work. The evidence shows that he did quit work for two days on account of the injury, and it may fairly be inferred that he was justified in quitting for that time on account of disability occasioned by his injury.

It is argued on behalf of the plaintiff in error that no disability of the plaintiff was shown as the result of an accident occurring while in the employment of the plaintiff in error. It is not denied that an accident occurred in the course of and arising out of the employment for which necessary first aid medical assistance was due and was furnished, but it is claimed that no permanent or temporary incapacity for work followed as a result of the injury. It appears that as the result of the collision Quinn was caught and bruised about the chest and back. He testified that after he quit work the day of the injury he went to the office of Dr. Niergarth, the company's physician, but the

doctor was not in, and after waiting about an hour and a half he went to Dr. Watson. He said that he had two cuts clear across the chest on the side and one in the back and was suffering pain in his chest and back; that Dr. Watson laid him on a table, pressed all over him, and told him he had a dislocation in his chest. The doctor took him out to the hospital and took a picture and then bandaged him. He testified that two days later he saw Dr. Niergarth, who told him he could take the bandage off and go to work, and he did go to work the next day. He further testified that he had never sustained any previous injury to his chest or back, and that this injury resulted in a permanent depression of his chest, which he had never had before; that his chest was sore, and there was a hole in the right side, right at the breast bone, which was not there before he got hurt.

Dr. Niergarth testified that he made no examination but Quinn told him that he was injured, that some ribs had been broken and he had been attended to, and said he was all right and thought he could go to work, and the doctor told him to go. Quinn said it did not hurt. The work which Quinn did after he went back on October 2 required him to be active and quick and to use his arms and body in checking the speed of the cars while going down-hill, each one loaded with 3200 or 3300 pounds of coal, by muscular strength holding the cars back by pressing against the front car and the mule. He worked steadily until about October 22. Physicians testified that it would have been practically impossible for him to have done so if any of his ribs had been broken, because of the intense pain which the work would have caused. Dr. Watson did not testify and the picture which he took at the hospital was not introduced.

About October 22, at ten o'clock in the morning, while at work, Quinn had a fainting spell. He described it as follows: "It wasn't a faint, neither. It was something I couldn't get out of. I knowed where I was but I couldn't

come out of it. I just dropped, with my mouth open, and I couldn't close it. I was suffering pain in my neck here,—this side; and in my chest and back,—right side of my chest, in the region of this fracture of the ribs," and that he never had a spell of that character before. On the hearing before the commission he testified: "The first symptoms that I had of ill-feeling I began to shake, my chest was quivering, and it started in my hands and my chest and went into my arms and head. The feeling in my hands in the beginning was just like they were numb, and the next feeling I experienced was on my chest. It felt like I was just going out like that—quivering." He became dizzy, could not get his breath, could not see and feel. He became unconscious. He had no pain in his head. He was dizzy, weak and shaky. The weakness did not affect his legs but was all in his chest and hands and neck. Water was put on his face and he was revived. He worked with fair regularity in coal mines until May 21, when he suffered a second fainting spell like the first. After this spell Dr. Clary was called to treat him. He tried to work in coal mines after May 21 but could not stand it. He has never had any more of the spells, but when the symptoms show that one is coming on he rubs his hands and arms. He testified that at night, just as soon as he starts to lie down and get quiet for a few minutes, the spell comes on him. It is an every night occurrence.

Dr. Clary, who was called to attend Quinn in May, after the fainting spell on May 21, was called by the plaintiff in error to testify but declined on the ground that what he then learned was privileged, without first being released from his obligation of secrecy by Quinn. The release was not given.

Dr. Marcy testified that he made an examination of Quinn on November 12, 1920. He found the first, second and third ribs had been fractured and the place concaved in on the right side of the chest. His heart was beating

142, which was very rapid. The doctor caused him to run about 500 feet, and the pulse went to 160. There was a scar about three inches above the right third rib. The condition was permanent and affected his breathing. It causes no pressure except upon the upper part of the bronchial tubes or lungs. The doctor could not tell the nature of the fracture, but he could tell that the ribs had been broken, and, from the depression, that they had not been restored to a normal position. The condition could only have been produced by an injury, which the doctor thought would have produced so much pain that Quinn should not work for about three weeks afterward.

Dr. Meixner examined Quinn just before the hearing by the commission, on September 12, 1921. His pulse was 94. The doctor found a depression involving the second and third ribs and a slight tenderness there. Quinn's health was then moderately good. He had no acute illness and there was nothing abnormal in the condition of his lungs.

The evidence does not connect the fainting spell with the accident. Dr. Marcy testified before the arbitrator that epilepsy was not indicated; that the first faint was no doubt due to the pain and pressure he was having. Assuming he was suffering from pain as a result of the injury, he thought it would have a tendency to produce a fainting condition. A neuralgic pain nearly always follows an injury of that kind. When a bone is broken in any part of the body, neuralgia and rheumatism will attack this point if there is any in the system. The acute pain from the injury would last probably three weeks. Dr. Niergarth testified, in response to a hypothetical question, that in his judgment there was no connection between the injury and the fainting condition about three weeks later, and Dr. George Mitchell testified to a similar opinion. Dr. Marcy's was the only testimony having any tendency to connect the injury with the fainting spells, and it was insufficient, because it could only account for the fainting condition the next May on the sup-

position that Quinn then had neuralgia or rheumatism as the result of the injury. If there was anything connected with the injury which would have produced the fainting spells six months afterward, the burden of showing the connection was on Quinn, and he failed to sustain it. The witnesses by whom it might be supposed he could show this connection were the doctors,—Watson, who treated him at the time of the injury and caused the picture to be taken, and Clary, who treated him for his fainting spell in May. For the reason that the disability to which he testifies is not shown to be the result of the injury the award of compensation was not justified by the evidence.

The plaintiff in error further argues that the award of compensation for 377 weeks, beginning July 1, 1921, is contrary to law. There is nothing in the evidence to justify this finding. If the claimant was incapacitated as the result of the accident, his incapacity began long before July 1, 1921. The finding that the partial incapacity will last for a period of 377 weeks is not within the province of the Industrial Commission. Neither the commission nor the courts are authorized to speculate as to the probable length of a period of temporary total incapacity. That can only be determined when the period ends. (*Stromberg Motor Device Co.* v. *Industrial Com.* 305 Ill. 619; *Groveland Coal Co.* v. *Industrial Com.* 308 id. 499.) It is no more possible, in cases of temporary partial incapacity, to determine when the period of disability will end than in cases of temporary total incapacity. *Groveland Coal Co.* v. *Industrial Com.* 309 Ill. 73.

The judgment of the circuit court will be reversed and the cause will be remanded, with directions to set aside the award and remand the cause to the Industrial Commission for further hearing.

*Reversed and remanded, with directions.*